**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| PATRICIA ENRIGHT | ) | |
| | ) | |
|     Plaintiff, | ) | |
| v. | ) | Civil Action No:_____ |
| | ) | |
| | ) | |
| TRANSUNION, LLC. | ) | |
| | ) | |
| | ) | |
|     Defendant. | ) | |

## COMPLAINT

Plaintiff Patricia Enright, by and through counsel, brings this Complaint against Defendant TransUnion, LLC. ("Defendant" or "TransUnion") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.    Ms. Enright was the victim of improper account and payment management by JPMC/Subaru Motors Finance in the heart of the Covid pandemic. For reasons that have not yet been disclosed, after JPMC received and deposited a payment from Ms. Enright in the amount of $12,392.12, it reported that the account was a charge off and the balance due was $12,364. Ms. Enright had made all her monthly lease payments on time and rather than wait for the end of the lease term, she obtained the amount of the pay-off to pay the final lease payments and purchase the vehicle, obtained a bank loan for said amount and tendered it to JPMC. In response to the payment, JPMC/Subaru notified Ms. Enright in writing that it had received and accepted the payment and also reported the same to the CRAs including TransUnion. Someone at JPMC believed that more was owed to purchase the vehicle, but they could not explain to Ms. Enright why. What they could not refute was that the remaining lease payments totaling about $900 for

the remaining few months had been paid and the lease itself had been fully satisfied.  Since the lease still had three months left in the term and JPMC still had the title to the vehicle, it most certainly could not claim that the account had been charged off or that there was a charge off balance of $12,364.  Initially, Ms. Enright had to correct things with JPMC and get it to acknowledge payment in full and release the title to the vehicle.  That took her about five months after the end of the lease to accomplish, but finally JPMC acknowledged that it had been paid in full by the check that it had received back in July 2020 and that nothing more was due.  It issued her a bill of sale and the title so that she could finally register the vehicle in her own name.  Once she had resolved that, she reasonably assumed that the correction of the credit reporting would follow.  What she did not know at the time was that TransUnion was no longer handling regular consumer credit disputes (as opposed to VIPs) and was outsourcing them to a low-cost, third-party mega processor located in India.  Since TransUnion was not responsible for training these processors, managing them or supervising them, it wanted to limit what they could do to impact credit disputes, so it made sure that they would not conduct any sort of investigation and make any determination based upon the facts, information and documentation that the consumer provided.  It really did not matter what the consumer said or what evidence they produced, these outsourced processors were not about to comply with the steps mandated by §1681i of the FCRA.  Instead, they were instructed to treat all documentation as "unacceptable," prepare a bare-bones ACDV and code the dispute to be auto processed by a computer that was not programed to conduct any sort of evaluation either.  The facts of this case lay bare the absurdity of this process and why TransUnion is incapable of meeting even the minimum requirements of the FCRA.  While it may be great for the TransUnion bottom line, this outsourcing program it has adopted is certain to result in the verification of inaccurate credit data.  As the facts herein

2

will set forth, any reasonable reinvestigation of the facts and documents submitted by Ms. Enright together with the information that TransUnion had in its own data would have made crystal clear that this account was not reporting accurately and needed to be corrected. But, TransUnion had no intention of conducting any such sort of investigation and relied exclusively upon whatever the furnisher (JPMC) decided. Despite the fact that TransUnion's corporate representative readily admits that simply parroting whatever the furnisher says is not in compliance with the FRCA, that is exactly what it did here and does in virtually all its consumer disputes. However, if that consumer threatens litigation or is an actor, athlete, political figure or any other sort of special VIP, then the treatment is totally different. TransUnion's outsourcing program surely saves it hundreds of millions of dollars annually, but the Ms. Enright's of the world are the ones who suffer and have to pay the price. Accordingly, Ms. Enright requests an award of actual damages, statutory damages, punitive damages, attorney's fees, and costs based upon TransUnion's violation of the Fair Credit Reporting Act 15 U.S.C. §1681 *et seq*.

## Parties

2.      Plaintiff Patricia Enright is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because she is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Patricia Enright.

3.      Defendant TransUnion LLC, (hereinafter "TransUnion"), is a consumer reporting agency, as defined in section 1681(f) of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in section 1681a(d) of the FCRA, to third parties. TransUnion regularly conducts these business activities in the Eastern District of Virginia by providing credit reports and other products to consumers and businesses in the Alexandria

3

division of the Eastern District of Virginia.   TransUnion maintains the office of a registered agent in Virginia in this district.   According to TransUnion's website, TransUnion maintains a Corporate Headquarters in Reston, Virginia at 1906 Reston Metro Plaza, Suite 400,500,600, Reston, VA 20190.   *See* www.transunion.com/about-us/global-locations/north-america.

## Jurisdiction & Venue

4.     This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681(p).   Venue is proper in this jurisdiction in that TransUnion resides in this judicial district by virtue of its extensive transaction of business in the EDVA, maintains the office of a registered agent in the Eastern District of Virginia, and identifies Reston, VA as one of its global corporate headquarters on its website.   Accordingly, TransUnion is subject to personal jurisdiction in this court.

## Factual Allegations

5.   Ms. Enright leased a vehicle through Subaru Motors Finance.   Subaru Motors Finance is affiliated with JP Morgan Auto ("Chase"), who is the furnisher of the credit information related to the inaccurate credit reporting at issue in this action.

6.   The 42-month lease term began in May 2017 with the final payment due in the end of November 2020.

7.   Ms. Enright made all of her lease payments on time.

8.   TransUnion knows Ms. Enright made all of her lease payments on time based upon the trended payment data that it maintains related to her account.

9.   Ms. Enright wanted to purchase her Subaru at the close of the lease term and started the process early.   Rather than wait until November when the lease was ending, she decided to get a payoff in July 2020.

10. Subaru Motors Finance provided her with an exact number of $12,392.12 to pay for the remaining lease payments and purchase the car in her sole name. Ms. Enright proceeded to obtain an auto loan for that amount and tendered the check to Chase.

11. By letter dated August 11, 2020, Chase admitted receiving the check on July 31, 2020.

12. Chase also told her in that August 11, 2020 letter that the payoff was short and that she needed to tender an additional $851.20 to pay off the vehicle.

13. Ms. Enright wanted to know why the number had changed from what they told her, but when she called Chase, it was during Covid, and she could not get a straight answer or explanation from them.

14. Based upon the original terms of the lease, the original account balance was $9,681 and her approximate remaining lease balance or payments due at the time of the car purchase in July 2020 was a little over $900.

15. Chase bungled the posting of the payment and the conclusion of the lease. Rather than post the funds to the account and showing the remaining $900 lease balance paid and arguing about whether or not the purchase price had been paid in full before it released the title, it acted as if no payment had been made at all. Instead of reporting the account as paid through the end of the lease term, it erroneously reported the account as a charge off (I9) which means that the account is 180 days past due and the lender has declared the account uncollectable.

16. After Chase had received and acknowledged receiving the $12,392.12 payment, it reported to TransUnion that the account was a charge off, that the current balance was $12,364 and the past due balance was $12,364. Chase further reported to TransUnion that the date of first delinquency (*i.e.* the first date that it became 30 days late without being brought current) was August 1, 2020.

17. Chase further reported that it wrote off $12,364.  None of TransUnion's reporting was factually accurate because Chase had receipted in a payment check for $12,392.12 in July 2020.

18. Had anyone on behalf of TransUnion decided to look into its own trended data payment history, TransUnion could see from its own records and data on this account that Chase also reported the large lump sum payment as part of the trended payment data.  Based upon information and belief, TransUnion could see the inconsistencies and absurdities of the situation based upon the data that it maintained.

19. Ms. Enright had paid the amount that Chase told her to pay and kept pressing for the release of the title.  In November 2020 right before the end date of the lease, Chase sent her a letter that had the heading: "Itemization of Payoff for Lease Vehicle Purchase."  The new balance was disclosed as $13,207.95.  Despite the fact that Chase had admitted and acknowledged (in writing) receipt and posting of her payment of $12,392.12, it showed no credit for that payment that it received on July 31, 2020.

20. Ms. Enright continued to fight for the release of her title and the resolution of this payment issue.  Finally, on April 28, 2021, Chase sent her a VEHICLE BILL OF SALE in which it acknowledged that the payoff amount was the exact amount it had originally quoted her and admitted receiving from her: $12,392.12.  It also recorded in that Bill of Sale that the date of the sale was December 18, 2020.

21. Because that was the exact amount that she had paid back in July 2020, Chase released its lien on the vehicle, assigned the title to her and sent the actual title to her so that she could register the vehicle with the DMV and record the new lien in favor of the new lender that financed the lease buy-out. Thus, as of December 18, 2020, Chase acknowledged in writing again that this problem had been resolved, and Chase admitted that it had been paid in full for the

vehicle in the exact same amount that it received back in July 2020. The title work always demonstrated that Ms. Enright paid the full amount for the lease and subsequent transfer of the title when she tendered the payment in July 2020.

22. TransUnion's data reflected the receipt of the $12,392.10 payment in July 2020.

23. Despite the fact that Ms. Enright had finally convinced Chase that she had paid the correct amount back in July, her problems were far from over. Now she had to grapple with the obviously erroneous credit reporting on the account.

24. In June of 2022, Ms. Enright telephoned the three major credit reporting agencies to dispute the manner that Chase reported the account on her credit file. Chase reported a charged-off debt in the amount $12,364 as of August 2020. This was inaccurate and misleading credit reporting regarding the transaction because Chase knew that it had possession of the full pay-off amount the day before the alleged charge-off happened.

25. From the inception of the lease through July 2020 TransUnion's records of the payment history on this account reflected "OK" for every month. According to TransUnion's corporate representative, that means that the payments had been made on time and were not late.

26. The letter from the lender dated August 11, 2020 (that had been provided to TransUnion on multiple occasions) verified that on July 31, 2020 the lender had received the payment of $12,392.12.

27. Even if Chase was quibbling about the amount of the pay-off, it had received ample funds to make the final three lease payments in advance. The obvious problem was that Chase failed to post the payment to the account. This was proven to be true when it sent her the lease buyout quote in November 2020 and claimed that she would have to pay $13,207.95 to purchase the vehicle with no mention of the $12,392.12 it had been holding since July.

28. TransUnion could see from its own records and data that this account had been paid on time for 37 consecutive months and just when the lender admitted and acknowledged in writing on its own letterhead that it had received a lump sum payment of $12,392.12, the reporting abruptly and inexplicably changed to charge-off.

29. TransUnion knows that accounts that are paid every month on time with not so much as a 30-days late, do not immediately accelerate to charge-off and are treated as a written-off bad debt.

30. Even more glaring was the assertion that the account had lapsed into 180 days past due such that Chase had decided to charge it off as an uncollectible bad debt that was reporting as an I9.

31. On its face, TransUnion could see that it could not accurately report the account as a charge off in July or August 2020 since Chase was also reporting the date of first delinquency as August 31, 2020.

32. TransUnion knows that the first report of delinquency on an account is not charge-off.

33. On June 17, 2022, Ms. Enright telephoned TransUnion and told them that it was reporting inaccurate information related to the Chase account. Ms. Enright stated that she had paid off the account but that the account was not reporting correctly. TransUnion issued an ACDV to Chase that requested Chase to provide or confirm complete id and to verify the account information.

34. TransUnion did not effectively communicate the dispute to Chase because there was no problem with account ownership information or identification. In violation of §1681i(a)(2)(B), TransUnion failed to provide all relevant information that it received from the

8

consumer. The issue related to the application of the payments and how Chase had held the payment without applying it appropriately at the end of the lease. Ms. Enright had explained all this to TransUnion in the telephone call, but TransUnion limited the information that it provided to Chase at this juncture.

35.     TransUnion's records indicate that Chase responded by stating that the dispute was not specific enough and that Chase had verified all of the consumer information. The identifying information was not the issue for this dispute and TransUnion's outsourced third party ACDV process did not comply with the FCRA mandate that it communicate all of the relevant information to Chase as part of this dispute. Based upon information and belief, TransUnion outsources call center services to a third-party provider, Teleperformance.

36.     In addition, TransUnion received the ACDV response from Chase and allowed the derogatory account information to remain in the TransUnion credit report without a full analysis of all the data available to TransUnion. On June 22, 2022, the day it received the ACDV response, TransUnion parroted the information reported by Chase when it issued the results of the reinvestigation. TransUnion reported no delinquent payments on the account, with one charge off reported in August 2020, and then a paid charge-off. TransUnion had to ignore all of its data to report the account in this fashion and failed to consider what Ms. Enright told TransUnion as part of the dispute process.

37.     This result was totally predictable based upon the manner in which TransUnion outsources its reinvestigation obligations pursuant to §1681i. TransUnion neither trains nor instructs its foreign processors to consider the information in its database together with the information and documentation from the consumer. Instead, it directs these third-party processors to code the ACDV to be sent for automatic computer processing that cannot and does

not conduct that investigation either. As a result, TransUnion totally abdicates its obligation to determine if the disputed data is verifiably accurate as mandated by §1681i(a)(1), (4) and (5).

38. Frustrated that TransUnion would not remove the item from her credit report. She consulted a lawyer about the situation. As her agent, the lawyer sent a credit dispute letter to the credit reporting agencies on Ms. Enright's behalf. In a two-page letter with supporting documentation, the letter explained the circumstances related to the purchase of the car at the conclusion of the lease. The letter noted the absurdity of saying that the account was charged off in August 2020 when Subaru Motors Finance sent a letter admitting that it received a payment of $12,392.12. The letter went on to note that Ms. Enright repeatedly contacted Subaru Motors finance to inquire what further funds could possibly be due, but Subaru Motors Finance never could articulate why Ms. Enright owed any additional funds. The letter included a copy of the letter acknowledging payment of the remaining lease payments and the pay-off for the vehicle. As far as the credit reporting goes, all lease payments were made on time and the total vehicle price was paid. The fact that the parties may have had a titling issue had no effect on the factual circumstances related to the lease, which was the actual account that was reported on Ms. Enright's credit report.

39. TransUnion received the credit dispute letter from Calaiaro, Valencik, Attorneys at Law on July 15, 2022.

40. TransUnion never issued an ACDV after receiving the dispute from Ms. Enright's agent, who were attorneys at law in Pennsylvania.

41. TransUnion had a duty to send an ACDV within five business days after receiving the letter on July 15, 2022.

42.     TransUnion did not provide any results of reinvestigation after the July 2022 dispute.

43.     Ms. Enright needed to obtain a mortgage for suitable housing, so she attempted to get a loan from Brentwood Bank, who obtained a credit report from Credco on September 6, 2022.  Ms. Enright was unable to obtain credit after TransUnion provided its credit information to Credco.  As a result, she continued to work to have the inaccurate charge-off removed from her credit file.

44.     Next, Ms. Enright sent a signed credit dispute letter with supporting documentation to TransUnion in September 2022.  The letter detailed the dispute and described how the lease account reported by TransUnion was completed with all the lease payments made timely and a purchase of the vehicle at the conclusion of the lease.  The letter noted that this was a 42-month lease that started on May 30, 2017 with a scheduled conclusion on November 30, 2020.  All the payments were made on time and a final payment amount reflected in TransUnion's data was $12,392.10.  No matter how the payments were processed, the undisputed factual evidence revealed that all of the lease payments were made on time with a significant final payment made at the end of the lease.  There was no way under any review of the events that transpired that TransUnion could report the account as charged off in August 2020.

45.     The credit dispute letter included significant supporting documentation including a copy of the lease that proved the lease term ended as described in the letter.  In addition, a letter from Subaru Motors Finance was included that showed that the lease account was paid off as detailed by the authorization of payoff letter that was also included.

46.     The combination of the documents with the descriptive dispute letter led to a complete factual demonstration that the lease should never have been credit reported as charged off in August 2020.

47.     Unfortunately, for Ms. Enright, she became a victim of TransUnion's dispute reinvestigation system that does not consider the factual circumstances related to the dispute. TransUnion has automated its dispute reinvestigation process to transfer the burden of its reinvestigation onto the furnisher without any meaningful consideration of the documents or factual circumstances presented by the consumer.   TransUnion just labels the consumers documents "unacceptable" and transfers the burden of reinvestigation to the consumer to send in different documents when the consumer has already been victimized by the furnisher's data. TransUnion's failure to consider the totality of the factual circumstances and consumer information is why its reinvestigations are negligent and reckless violations of the FCRA.  The fact that TransUnion has implemented and relied on these process for years without making any changes to protect consumers makes the entire reinvestigation process reckless and supports significant punitive damages for violations of the FCRA.

48.     TransUnion instructs its processors in India that it neither trains, manages nor supervises to treat virtually all supporting documentation to be "unacceptable" to excuse the fact that they are neither trained nor authorized to consider the documents and make account decisions based upon their import.

49.     On September 29, 2022, TransUnion issued an ACDV to the furnisher that stated in part "claims company will change. Verify all account information." This was an inaccurate assessment of the dispute because Ms. Enright told TransUnion why it was reporting inaccurate information and why TransUnion should change the information.  TransUnion's statement is

emblematic of the larger problem that TransUnion seeks to transfer its reinvestigation burden to other entities. TransUnion should have changed its data to correct the factual inaccuracies related to the completion of the lease as demonstrated by the trended payment data and the documents provided by Ms. Enright.

50.     TransUnion's September 29, 2022 ACDV went on to state that it was "Unable to authenticate documentation" but the reality is that the automated outsourced ACDV process is designed to never authenticate any information. Once again, TransUnion fails in its most basic responsibilities under 15 U.S.C. §1681i to reinvestigate a dispute by reviewing and considering all the relevant information.

51.     On October 4, 2022, the furnisher responded by ACDV to confirm this was an auto lease verifying that the all the payments were tendered just as Ms. Enright stated in her letter and supporting documentation. Because the lease was concluded and all the payments were tendered, there was no factual dispute about the circumstances or that the lease should be reported as paid and closed. What neither TransUnion nor Chase were prepared to correct was the fact that the $12,392.12 payment was received and accepted the very same month that it was reporting the account as 120+ days past due and in collections.

52.     On October 5, 2022, TransUnion's computer processed the ACDV response. TransUnion has implemented a system where they do not consider the furnishers response in conjunction with the information that the consumer has provided to TransUnion. The end result is that TransUnion simply repeats the furnisher's response and allows that response to provide the source of the information for the results of reinvestigation. This is euphemistically called "parroting" under FCRA case law as much like a trained parrot, TransUnion simply repeats the furnisher's response.

53.     TransUnion knows that parroting is not in compliance with federal law and the FCRA, but it does it anyway to save money and avoid having to train and allow outsourced third-party entities to think or evaluate the evidence provided by the consumer alongside the information within its own records.

54.     The results of the reinvestigation allowed the derogatory charge-off to remain on Ms. Enright's credit file. The monthly rating history for the account demonstrates the absurdity of the credit reporting because TransUnion reports all on time and "OK" lease payments with just one monthly charge off reporting out of nowhere. TransUnion's reporting was factually inaccurate and misleading under any review of the factual circumstances which proved Ms. Enright tendered all the lease payments due, which was the point of the credit reporting of the automobile lease account in the first instance.

55.     Ms. Enright needed to arrange for new housing and desired a mortgage to purchase a property. The charge-off reporting on her credit file impacted her otherwise good credit history. This need for housing was why she kept disputing the information. Based upon information and belief Factual Data provided information to Howard Hanna Mortgage from TransUnion on November 18, 2022, that included the inaccurate information that is the subject of this Complaint. Once again, the inaccurate credit reporting frustrated Ms. Enright's ability to obtain credit in the manner desired.

56.     In January 2023, Ms. Enright tried once again to convince TransUnion that the credit reporting for this automobile lease account did not make any sense because she made all the lease payments due and purchased the car that was the subject of the lease. The letter summed up how any reasonable review of the factual circumstances would show that all of the auto lease payments were made as the dispute letter concluded:

I had paid all the lease payments and the price to purchase the car. Even if there had been some discrepancy about the amount of the payment and they later claimed that I owed more to buy the car (which they did not), in July 2020, I was fully paid up through the end of the lease until the start of December. JPMC could not have reported me late or past due in August 2020 because it admits that it had received payment well in excess of all the remaining lease payments through the lease term in the end of November. No matter how you look at it, in July 2020 JPMC could not have reported me anything but paid and current.

Please look at all the proof and documents that I have attached, and you will have to reach the same conclusion. I need you to remove that ridiculous charge off notation for August 2020 and anything derogatory on this account. If you do not correct this account data, please tell me what you did to investigate and how you could examine those documents and say that in August 2020 there was anything due on this lease much less a charge off.

57.    The dispute package included a copy of the letter from Subaru Motors finance that proved that Ms. Enright has paid the final lease payments and account payoff in July 2020 such that there could not have been any charge-off of the account the following month in August 2020.   The credit dispute package also included automobile titling documentation that demonstrated she paid the full purchase price for the vehicle.

58.    TransUnion received two copies of the credit dispute package one on January 27, 2023, and the other January 30, 2023.  Pursuant to §1681i(a), TransUnion had a duty to conduct a reasonable reinvestigation of this dispute by considering all available information.

59.    TransUnion issued another ACDV to the furnisher on January 31, 2023.  Once again, the ACDV stated, "Claims company will change."  This is not an accurate summation of Ms. Enright's dispute because her dispute letter requested TransUnion to change the credit reporting because the data provided by the furnisher was factually inaccurate and misleading. In July 2020, Ms. Enright had paid all of the lease payments and the purchase price for the vehicle. There was no balance owed to charge-off as of August 2020.  The fact that the furnisher applied the payment incorrectly or misallocated the payments did not change the factual circumstances that all of the payments were made and there was nothing to charge off.

60.     TransUnion could tell from its trended payment data that all of the payments were made, and it had the supporting documentation from Ms. Enright to prove that the account could never have been charged off in August 2020.  TransUnion also knew from an ACDV response received February 6, 2023, that all of these payments had been tendered.

61.     Rather than review and consider all of the available information as required by FCRA, TransUnion simply repeated the response of the furnisher.  This was not an accident or mistake by TransUnion because it has programmed its computer to respond after the furnisher responds with the exact information provided by the furnisher.  TransUnion's actions are reckless when taken in conjunction with the requirements that TransUnion delete any information that cannot be verified.

62.     On February 7, 2023, TransUnion once again issued the results of the reinvestigation by updating the information without removing the charge off notation reported for August 2020 on the credit file.  As a result, Ms. Enright continued to suffer through the problems of inaccurate credit reporting because of TransUnion's actions and failed reinvestigation policy.

63.     Ms. Enright sought a mortgage, and she could not obtain a mortgage on multiple occasions like in February 2023 from First National Bank and July 2023 from Union Home Mortgage.  As a result, she suffered actual damages, emotional distress, loss of access to credit, inconvenience, and loss of time dealing with the problems that TransUnion refused to correct.

## COUNT I
### Fair Credit Reporting Act
### 15 U.S.C. §1681i

64.     Plaintiff incorporates paragraphs one (1) to sixty-three (63) as if fully stated herein.

65.     Defendant TransUnion has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  TransUnion is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681i by failing to comply with the enumerated statutory provisions when Ms. Enright disputed the Chase account as part of her disputes.

66.     TransUnion violated 15 U.S.C. §1681i(a)(1) by its conduct related to Ms. Enright's credit disputes as identified in the factual statements.  TransUnion failed to review and consider the information included in the letter and conduct a reasonable reinvestigation of the disputes after consulting its own records and data concerning the trade line.  TransUnion simply issued ACDVs with no regard for the circumstances related to Ms. Enright's purchase of the vehicle as permitted by the lease.   TransUnion would never contact Chase outside an electronic ACDV to inquire as to the total circumstances and never considered Mrs. Enright's documents, dispute letter, and the historical record information available in TransUnion's internal data that proved the dispute letter truthful, which resulted in misleading and inaccurate credit reporting.

67.     The FCRA requires that in conducting its reinvestigation under 15 U.S.C. §1681i(a)(1)(A) that a credit reporting agency must delete information about a consumer unless it is able to verify said information as stated in 15 U.S.C. §1681i(a)(5)(A):

> In general If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or **cannot be verified**, the consumer reporting agency shall- (i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and (ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.  15 U.S.C. §1681i(a)(5)(A) (emphasis added)

68.     According to Black's Law Dictionary, the ordinary meaning of verify is, "to prove to be true; to confirm or establish the truth or truthfulness; to authenticate." Based upon the information provided in the dispute letter, TransUnion could not have met the high bar of verification necessary to allow the Chase Auto account to remain on Ms. Enright's credit report after the credit disputes because of the additional information and factual detail she provided about purchasing the vehicle after having tendered all previous lease payments on time. TransUnion also knew that Chase admitted to receiving the pay-off figure in July 2020, yet Chase continued to report the date of first delinquency as August 2020.

69.     TransUnion also violated 15 U.S.C. §1681i(a)(4) after receiving Mrs. Enright's disputes in June 2022, July 2022, September 2022, and January 2023 as described in the factual averments because it failed to review and consider all relevant information that Mrs. Enright provided about the lease and simply relied on the ACDV process.

70.     Trans Union also violated 15 U.S.C. §1681i(a)(5) by implementing a system that never reviews and considers the information provided by the consumer in conjunction with the furnisher response in accordance with the FCRA.

71.     TransUnion also violated 15 U.S.C. §1681i(a)(6) when it failed to provide the notice of the results of the reinvestigation after the July 2022 dispute.

72.     TransUnion also violated 15 U.S.C. §1681i(a)(7) when it failed to provide an accurate description of what it did to reinvestigate Ms. Enright's disputes.

73.     Punitive damages are warranted for TransUnion's actions based on the totality of the circumstances. TransUnion should have done more than rely on the ACDV exchange and implemented a system that parroted the ACDV response from the furnisher without conducting the required steps of reinvestigation identified by the statute.

74.     Mrs. Enright suffered actual damages including time spent addressing the problem by disputing with TransUnion, improper denial of access to credit, inability to obtain a mortgage, inconvenience, and emotional distress damages.  In addition, punitive damages are necessary based upon TransUnion's reckless disregard for reviewing information submitted by consumers and issuing ACDVs and immediately parroting the furnisher response without review and consideration of the totality of the circumstances.

**COUNT II**
**Fair Credit Reporting Act**
**15 U.S.C. §1681e(b)**

75.     Plaintiff incorporates paragraphs one (1) to seventy-four (74) as if fully stated herein.

76.     Defendant TransUnion has willfully and/or negligently violated the provisions of the FCRA by willfully and/or negligently failing to comply with its obligations as a credit reporting agency under the FCRA.  TransUnion is liable to the plaintiff for damages under 15 U.S.C. §1681n and §1681o because it violated 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the plaintiff's credit report.

77.     TransUnion willfully and/or negligently violated the Fair Credit Reporting Act at 15 U.S.C. §1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of information reported about Mrs. Enright.

78.     TransUnion's publishing of inaccurate information was a substantial factor in the denial of credit to Ms. Enright when she applied for a home mortgage.  TransUnion provided inaccurate information to Factual Data on September 23, 2022, and November 18, 2022 as well as to Credco on September 6, 2022.  In addition, TransUnion is believed to have provided

inaccurate information to First National Bank on February 16, 2023, and Union Home Mortgage on July 11, 2023.

79. Ms. Enright suffered damages including: the denial of credit, loss of time working to restore her credit; inability to obtain a loan to purchase a home, inconvenience, and emotional distress caused by TransUnion's violations of the FCRA.

80. Punitive damages are necessary because TransUnion has implemented a system and process that it knows results with inaccurate credit reports being sold to furnishers because TransUnion fails to invest the resources into enacting procedures to protect consumers. TransUnion has implemented procedures to allow inaccurate data to remain in its system that cannot be verified if reinvestigated properly. Only punitive damages can curb this type of conduct that operates in reckless disregard for accurate credit reports.

## **Prayer for Relief**

Wherefore, the Plaintiff prays that the Court award the following relief:

a)  Actual damages based upon Defendant's violations of the FCRA;

b)  statutory damages against Defendant's based upon violations of the FCRA;

c)  punitive damages based upon the violations of the FCRA

d)  costs and reasonable attorneys' fees incurred by the Plaintiff;

e)  prejudgment interest

f)  all other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted,
Patricia Enright

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Thomas B. Christiano, VSB 43940
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr. Suite 201
Reston, Virginia 20191
(571) 313-0412
Fax:(571) 313-0582